## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

**CIVIL ACTION NO. 07-197-DLB**

**NANCY LEIDNER**                                                                          **PLAINTIFF**

**vs.**                          **MEMORANDUM OPINION AND ORDER**

### JANET NAPOLITANO, AS SECRETARY OF
### DEPARTMENT OF HOMELAND SECURITY                          **DEFENDANT**

\* \* \* \* \* \* \* \* \*

Plaintiff Nancy Leidner, an employee of Defendant Department of Homeland

Security, commenced this employment discrimination action against her employer alleging

claims of sexual harassment, gender discrimination, age discrimination, and retaliation–all

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[1] On

February 19, 2008, Defendant filed a Motion to Dismiss, and in the Alternative, Motion for

Summary Judgment (Doc. #11). After the matter was fully briefed and an Oral Argument

was held, the Court granted in part and denied in part Defendant's motion. The Court

dismissed Plaintiff's age discrimination claim and a retaliation claim alleging witness

tampering in violation of 18 U.S.C. § 1512(b)(1) & (b)(2)(A). (Doc. #23). Thereafter, the

Court granted Plaintiff leave to file an Amended Complaint to include an additional

---

[1] Plaintiff's Amended Complaint also makes reference to a claim for "Equal pay." (Doc. #33 at ¶ 20). Although no further reference was made in the Amended Complaint, Plaintiff testified that she was seeking damages under the Equal Pay Act (EPA). (Leidner Depo, Day 1 at 14). However, Plaintiff's counsel conceded at oral argument that Plaintiff is no longer pursuing this claim as she has not fully exhausted her administrative remedies. Therefore, any claim arising under the EPA is hereby dismissed.

1

retaliation claim. (Docs. #32, 33).

This matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. #61). The motion has been fully briefed, (Docs. # 65, 72, 77), and Oral Argument was held on November 17, 2010.[2] The matter is now ripe for review. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Nancy Leidner has been employed as a Federal Air Marshal (FAM) for the Federal Air Marshal Service (FAMS), with the Transportation Security Administration (TSA), a component within the Department of Homeland Security (DHS), since June 2002. (Doc. #33 at ¶ 1). Throughout her employment, she was an employee with the Cincinnati (CVG) Field Office. *Id.* Plaintiff began her tenure as the only female FAM and is currently the only female FAM on staff in the CVG Field Office.[3] *Id.* at ¶ 8. Prior to her employment as a FAM, Plaintiff worked in the Federal Bureau of Prisons (BOP) for eight years, including two years at a Supervisory Federal level.[4] *Id.* at ¶ 7.

---

[2] Pursuant to the Court's March 15, 2010 Order (Doc. #66) and the Court's May 6, 2010 Order (Doc. #76), Defendant has filed its Memorandum in Support of Summary Judgment (Doc. #65), reply brief (Doc. #77), and all accompanying depositions and exhibits under seal. Pursuant to the parties Consent Protective Order (Doc. #28), Plaintiff has filed her response brief (Doc. #72) and all accompanying depositions and exhibits under seal. Additionally, on Defendant's motion (Doc. #83), the Court closed the Oral Argument proceeding to the public.

[3] For a period of her employment, there was a female supervisor, SSI - 49 CFR who also worked in the CVG Field Office.

[4] Leidner started working with the BOP on July 24, 1994 at FMC-Greenville. (Leidner Depo, Day 1at 72). Her first position was a secretary, and she worked for approximately eighteen months before becoming a corrections officer in 1996. *Id.* at 74, 76. She was a corrections officer until October 2000 and, at times, an acting supervisor. *Id.* at 77. During her tenure as a corrections officer, she was also a senior officer specialist and responsible for training subordinate officers. *Id.* at 78. In October 2000, Leidner transferred to FMC-Lexington and started a GS9 correctional supervisor position. *Id.* at 79, 81. During her time as a supervisor, Leidner also acted as the operations lieutenant on a rotating basis. *Id.* at 87. On a normal shift, she managed twenty to thirty correctional officers. *Id.* at 89.

Shortly after Leidner began working at the CVG Field Office, rumors began to circulate that she was living and having an affair with a fellow male FAM, [SSI - 49 CFR] [SSI - 49 CFR 1520.5]. (Hurks Depo at 8; Leidner Depo, Day 1 at 151-52). Leidner heard about the rumor from several of her co-workers. (Leidner Depo, Day 1 at 151-52). However, since Leidner had just started and wanted to "get along" with her fellow co-workers, she never reported this rumor to anyone in the CVG Field Office or to the Office of Civil Rights at either TSA, Federal Aviation Administration (FAA), DHS or Bureau of Immigrations and Customs Enforcement (ICE).[5] Id. at 152-153.

In November 2002, Plaintiff went on temporary duty (TDY) until August 2004. Id. at 153-155. During this time, she was in Atlantic City, New Jersey and Reston, Virginia and was not working at or with members of the CVG Field Office.[6] Id. at 150, 154. While she was on TDY, Leidner was not made aware of any other rumors being spread about her at the CVG Field Office. Id. at 156. After returning from TDY, Leidner resumed her regular flight schedule and, from August 2004 through August 2009, she only worked three or four days each month in the CVG Field Office because most of her work involved flying. Id. at 100.

---

[5] Despite the fact that Leidner alleges she did not want to confront management because she was just trying to "get along" her first few months at the office, she did report a separate incident involving male FAM[SSI-] When FAM[SSI-] made unwanted sexual advances in 2002, she reported this to ATSAC[SSI-] (Leidner Depo, Day 3 at 8-9[SSI-] Deposition at 34). ATSAC[SSI-] took this complaint seriously as it was one of many that he had received against FAM[SSI-] (Pickett Deposition at 34).

[6] However, for approximately three or four months during 2003, Leidner was back and forth between Atlantic City and Cincinnati. (Leidner Depo, Day 1 at 154-155). She spent two weeks in Atlantic City and then two weeks in Cincinnati. Id. While in Cincinnati, she was flying and, therefore, not in the CVG Field Office very often. Id. at 161.

3

Beginning in February 2005, Nancy Warman[7] told Leidner that a rumor was circulating around the office that Leidner had performed a striptease for FAM ▓SSI - 49▓ ▓SSI - 49 CFR▓ at his going away party at Famous Dave's Restaurant.[8] (Leidner Deposition, Day 1: 162-163, 218). Leidner was unaware who Warman heard the rumor from, but Leidner later heard from FAM ▓SSI - 49 CFR▓ that FAM ▓SSI - 49 CFR▓ was responsible for starting the rumor. *Id.* at 163-164, 179. Leidner claims that Mills also told her that Assistant Special Agent in Charge (ASAC) Britsch was conducting an investigation and had confronted ▓SSI▓ about the rumor.[9] *Id.* at 181-182, 188. However, ASAC Britsch never questioned Leidner about the alleged striptease, nor did Leidner complain to anyone in the CVG Field Office concerning the rumor. *Id.* at 187-188.

At ▓SSI - 49 CFR▓ going away party, ▓SSI▓ also made inappropriate and offensive

---

[7] Nancy Warman is the Network Specialist II at the CVG Field Office and is responsible for the computers and network. (Warman Depo at 7). She was not employed by the FAMS, but rather the Scientific Application International Corporation (SAIC). *Id.* at 6.

[8] At the party, Leidner was sitting with Warman and FAM ▓SSI - 49▓ and they kept joking that Leidner should strip for ▓SSI - 49▓ as a going away present. (Leidner Depo, Day 1 at 218). Leidner became very uncomfortable and repeatedly stated she would not be stripping for him. *Id.* Leidner speculates that it must have been ▓SSI▓ who started the rumor since he was present during this conversation. *Id.* at 219.

It is also important to note that Warman originally gave a statement on September 18, 2007 to Becki Speck, EEO Contract Investigator for the TSA, that stated Leidner did not perform a striptease the night of the going away party. (Warman Depo at Ex. 2). However, in a later declaration, signed April 4, 2008 and prepared by U.S. Attorney Thomas Lee Gentry, Warman stated that she and Leidner pulled FAM ▓SSI - 49▓ into the woman's restroom that night. Another restaurant patron was in the restroom but left after they entered. Leidner pulled down her blue jeans, exposed her thong, leaned over the vanity, and wiggled. Warman stated FAM ▓SSI - 49▓ appeared uncomfortable and did not approach Leidner. Then restaurant management knocked on the door, and they all went back to the table. Warman stated she did not mention this during the prior investigation because she was only asked if Leidner performed a striptease, and she did not consider what Leidner did to be a striptease. *Id.* at Ex. 3.

[9] Leidner only heard about this investigation from ▓SSI▓ who was not a part of CVG management, and she never heard from anyone in management that ASAC Britsch was conducting an investigation, formal or informal. (Leidner Depo, Day 1 at 189). Other than what people told her, she has no proof that management was aware of the striptease rumor. *Id.* at 203. Management denies ever having heard the rumor.

4

comments regarding Leidner's breasts and inquired whether she had breast implants.[10] *Id.* at 218-219. Around the same time as the stripping rumor, FAM [SSI - 49 CFR 1520.5] approached Leidner on an overnight at her hotel room and asked to come in.[11] *Id.* at 225. [SSI - 49 CFR] had never done this before, and Leidner believed it to be an inappropriate sexual advance. *Id.* However, Leidner again never complained about these incidents to anyone at CVG management, TSA or ICE. *Id.* at 225-226.

Leidner had also been the subject of several rumors about her having affairs with fellow male FAMs. ([SSI] Depo at 8; [SSI] Depo at 10). Assistant to the Special Agent in Charge (ATSAC)[SSI - 49 CFR] allegedly started a rumor in 2003 that Leidner was having an affair with FAM [SSI - 49 CFR 1520.5] although Leidner was not made aware of the rumor until she returned from TDY in late 2004. (Leidner Depo, Day 1 at 190, 200). In May 2006, Leidner became aware that [SSI] told co-workers she was having affairs with FAMs [SSI - 49 CFR 1520.5] and [SSI - 49 CFR 1520.5]. *Id.* at 217. After these rumors continued to circulate, Leidner felt a lack of respect from her fellow FAMs. *Id.* at 222. Male FAMs started to make comments in Leidner's presence about certain female passengers in the airport. *Id.* at 224. Leidner told them she did appreciate these types of remarks, yet she never reported any of this behavior to CVG management or the TSA's Office of Civil Rights. *Id.* at 231.

---

[10] Despite Leidner's allegation in her Amended Complaint (Doc. #33) that [SSI] made these comments in front of her fellow FAMs, Leidner stated in her deposition that she did not know if anyone else had heard them besides Warman. (Leidner Depo, Day 1 at 220). Furthermore, she never reported these comments to management. *Id.*

[11] Leidner first disclosed this alleged sexual harassment in her 2009 deposition; she made no mention of it while the TSA 2007 investigation was going on. (Doc. #65 at Ex. F; Leidner Depo, Day 1 at 225).

frequently spoke about visiting red light districts while on overseas flights.[16] (SSI - 49 CFR) Depo at 15). Once again, Leidner did not complain to anyone about these remarks. (Leidner Depo, Day 3 at 13-14).

The record reflects that management was aware of some of the rumors that were circulating about Leidner.[17] ATSAC (SSI - 49 CFR) told Special Agent in Charge (SAC) John Davis that he thought Leidner was having an affair with fellow FAM (SSI - 49 CFR 1520.5) [18] (Davis Depo at 18-20). SAC Davis testified that he did not believe this information was credible and did not look into the matter further. *Id.* at 20. Additionally, in January 2006, Leidner told SAC Davis about the need for in-house training on ethical and sexual harassment issues based

---

[16] Leidner seems to implicate that speaking about the red light district is somehow offensive to women and lends credence to her hostile work environment claim. However, FAM (SSI -) stated in his deposition that he visited the red light district one time to "get a few beers." (SSI -) Depo at 11). Additionally, Leidner does not indicate that FAM (SSI -) ever discussed his visit with her. Furthermore, Leidner attempts to use the fact that FAMs spoke about visiting red light districts to suggest that the male CVG FAMs were ordering prostitutes while on duty. See (Doc. #72 at 17). She points to the indictment of CVG FAM David Slaughter and another incident involving a FAM from the Newark Field Office in New Jersey to support her argument. *Id.* FAM Slaughter was arrested for imprisoning a prostitute he ordered while on duty in July 2006. *Id.* The Newark FAM was arrested for soliciting sex from an undercover police officer in Honolulu, Hawaii on May 31, 2007. *Id.* at Ex. 3. However, Leidner fails to mention why these incidents are even relevant to her case. The mere fact that these incidents occurred, without more, does not support her hostile work environment claim. The Court finds these facts are irrelevant to the present case and will not consider them in adjudicating this motion.

[17] Leidner contends that Warman discussed the alleged rumors with SAC Davis over lunch. (Doc. #72 at 5). However, neither Warman or SAC Davis ever testified to this effect. Warman only testified that she spoke to SAC Davis in passing and, from that conversation, assumed he knew about the rumors. (Warman Depo at 38-39). However, Warman specifically stated that she "didn't tell Mr. Davis anything." *Id.* at 39. Furthermore, Warman never testified what rumors she assumed Davis had knowledge of and when this supposed conversation took place.

[18] Leidner also contends that ATSAC (SSI -) wanted to place Leidner under investigation concerning this rumor. However, the record does not reflect this assertion. See (Davis Depo at 18-20). Furthermore, ATSAC (SSI -) recalls the incident differently than SAC Davis. ATSAC (SSI -) testified that he heard several FAMs talking about FAM (SSI -) one day. They were making fun of him, stating that he was trying to date Leidner in Atlantic City, where they were both on assignment. ATSAC (SSI -) stated that he reported this to SAC Davis; the emphasis was on FAM (SSI -) not Leidner. ( Depo at 30).

7

Leidner contends that the "dysfunctional management"[12] of the CVG Field Office permitted a sexually charged environment where women were looked down upon and degraded.[13] The office had little, if any, in-person EEO training regarding discrimination or sexual harassment between 2002 and 2006.[14] (Davis Depo at 39). CVG management was made aware of a couple instances in which male FAMs were soliciting dates from female flight attendants.[15] *Id.* at 32. Leidner testified the male FAMs made inappropriate statements of a sexual nature, referring to women as "bitches" and "whores." (Leidner Depo, Day 3 at 10). However, these comments were not specifically directed at Leidner, and no one ever called her a "bitch" or "whore" to her face. *Id.* at 14-15. FAMs also

---

[12] Leidner contends the CVG Field Office had "dysfunctional management" that created a "state of chaos." (Doc. #72 at 2, 20). Individuals who disagreed with management were scrutinized and suffered retaliation; as one FAM testified, "your head goes on a chopping block." ▮▮▮▮▮ Depo at 69). Another FAM particularly attributed this to former SAC Davis: "It wasn't a fun office to work in ... when he [Davis] was in charge. It's gotten a 180-degree turnaround since then." ▮▮▮▮▮ Depo at 9).

[13] Certain male FAMs made statements that women were not capable of being FAMs. (SSI - Depo at 8). However, Leidner never testified that these comments were made directly to her or that she had knowledge of them.

[14] However, FAMS employees were required to annually complete online ethics training. The program would involve a series of readings and questions, and, after completion, a certificate was issued. (Britsch Depo at 67-68).

Some of the supervisors and FAMs thought there might have been in-person training during this time, but could not recall for certain. FAM (SSI - 49) testified that the FAMs watched videos on sexual harassment (in addition to the online training), but he could not recall the exact dates. (SSI - 49) Depo at 17). ATSAC (SSI - 49) testified he completed both online and in-person training; however, he could not recall the dates. (SSI - 49) Depo at 13-14).

[15] The first FAM was given both a verbal warning and letter of counsel. The second FAM had other conduct issues and voluntarily resigned from the FAMS. (Davis Depo at 34).

There is also testimony by a couple FAMs that during training sessions management announced that they were getting complaints from airlines regarding how FAMs were treating flight attendants. (SSI - Depo at 23; (SSI - Depo at 18). They were told to be professional and not to cause any other problems. However, the record does not reflect whether these announcements were referencing the male FAMs who were soliciting dates or separate incidents and, moreover, whether they were concerning sexual harassment issues.

6

on some inappropriate comments she heard.[19]   (Leidner Depo, Day 1 at 228). Furthermore, in May 2006, FAM [SSI - 49 CFR] contacted ATSAC [SSI - 49 CFR] to ask how to file an Equal Employment Opportunity (EEO) Complaint against Leidner because she accused [SSI - 49] of spreading rumors about her. ([SSI - 49] Depo at 16). However, ATSAC [SSI - 49 CFR] stated that FAM [SSI - 49] did not tell him the specific nature of the alleged rumors.[20] ([SSI - 49 CFR] Depo at 21). ATSAC [SSI - 49 CFR] then discussed the matter at a meeting with other supervisors . Id. SAC Davis testified that he instructed ATSACs [SSI - 49 CFR] and [SSI - 49 CFR] to investigate the matter if a complaint was made by Leidner. (Davis Depo at 15-16). Sometime after that, FAM [SSI - 49] old ATSAC [SSI - 49 CFR] that the matter had been resolved. [SSI - 49 CFR] Depo at 20-21). Additionally, around the same time, ATSAC [SSI - 49 CFR] heard a rumor that Leidner was dating FAM [SSI - 49 CFR (1520.5)]   Id. at 22.

Leidner claims it was very difficult to work in such an environment. Because individual FAMs did not work out of the CVG office, with the exception of training days, communication between management and FAMs and among fellow FAMs was sporadic and piecemeal. Leidner contends that this made it easier for rumors to spread.[21] Leidner

---

[19] Despite this meeting with SAC Davis to address training on ethical and sexual harassment issues, Leidner testified (twice) that she did not complain about the type of treatment she specifically was receiving from her fellow FAMs. (Leidner Depo, Day 1 at 234; Doc. #65, Ex. E). However, Leidner contradicted her testimony in an affidavit dated April 16, 2010 when she stated: "In the spring of 2006, I spoke with SAC Davis about the unprofessional attitude of [my] fellow FAMs and the need for ethics training [due to] the continuous false rumors that were circulating around the office about me having affairs with co-workers." (Doc. #72 at Ex. 5).

[20] There is contradictory testimony in the record concerning what FAM [SSI] actually said to ATSAC [SSI -] during this initial conversation. Viewing the facts in a light most favorable to the Plaintiff, the Court will assume that CVG management had knowledge that Leidner accused [SSI] of spreading rumors that she was having affairs with FAM [SSI - 49 CFR]

[21] Leidner also claims that many of the FAMs believed the rumors that were circulating about her. However, she has presented no evidence to support this other than mere speculation. In fact, many of the FAMs testified that rumors were quite common around the office, and they never believed anything they heard. See [SSI - 49] Depo at 12; [SSI -] Depo at 12).

8

also alleged that during this time, FAM SSI - 49 CFR started a rumor that she had filed an EEO Complaint against another FAM.[22] She believes that she was ostracized by coworkers because of this rumor. When Leidner entered a room, discussion would stop and co-workers would disperse and reconvene somewhere else to continue talking. SSI - 49 CFR Depo at 29; Leidner Depo, Day 3 at 38). Fellow FAMs even stated that they did not want to fly with Leidner.[23] SSI - Depo at 21).

In December 2005, the FAMS posted a nationwide vacancy announcement (060030) for a Supervisory Federal Air Marshal, J-Band position (ATSAC position). (Doc. #65 at Ex. U). All applicants for the ATSAC position were required to complete an application detailing their educational and work experience and address various "competencies" required for the job. (Doc. #65 at Ex. T). Applicants were electronically screened for basic qualifications and eligibility requirements, regardless of whether they had completed a supervisory probationary period.[24] (Doc. #65 at Ex. U). Selected applicants were then further

---

[22] Leidner does not have any evidence that FAM SSI - started this rumor about her. FAM SSI - stated that he heard from ATSAC SSI - that two FAMs were filing EEO complaints against each other, but was not told any other details. SSI - denies ever starting a rumor about Leidner. (Doc. #65 at Ex. F). FAM SSI - 49 stated he heard the rumor during conversations with other FAMs (not identified) that two CVG FAMs were filing EEO Complaints against one another. FAM ___ assumed one of the FAMs was Leidner as she was the only female FAM in the office. He denied that he heard the rumor from FAM ___ . Id.

[23] ___ testified that this occurred both before and after Leidner filed her pending lawsuit. SSI - Depo at 21). Prior to the lawsuit, they did not want to fly with her because she was a woman; after the filing of the lawsuit, they did not want to fly with her because they did not want to get involved with the lawsuit. Id. Leidner has never testified that she actually heard male FAMs say they did not want to fly with her, nor has she testified that she knew about these issues at the time she was working in the CVG Field Office. ATSAC SSI - 49 testified that the only time a male FAM has requested not to fly with Leidner was after the filing of her lawsuit because they did not want to get involved. SSI - 49 Depo at 43).

[24] Neither Immigrations and Customs Enforcement directive, OMS 3360, Merit Promotion Program, or TSA Management Directive 1100.30-4, Permanent Internal Assignments, mandate that an individual who has completed a federal supervisory or managerial probationary period is automatically selected for promotion. (Doc. #65 at Ex. T). Management Directive 1100.30-4 does not require the use of non-competitive selection or promotion policies, even in circumstances where applicants have completed a federal supervisory probationary period. (Doc. #65, Ex. S ¶ 5(A)). Pursuant to paragraph 5(A), selecting officials have the authority to determine whether permanent internal assignments will be filled competitively or non-

9

evaluated by panels located in the applicants' offices of record. *Id.* Panel scores were entered into an automated system that generated data reports to determine the "first cut-off scores." (Doc. #65 at Ex. T). The cut-off scores were established at natural break points occurring in the ranges of scores at each office location. *Id.* All applicants who fell above the established cut-off scores were referred for further assessment and rating to their Special Agent-in-Charge (SAC) of record. *Id.* Final selection referral lists were based on these ratings, included the highest scoring individuals, and were developed as either competitive or non-competitive, depending on applicant eligibility. *Id.* Applicants who had completed the required probationary period were eligible to be on a non-competitive referral list. *Id.* After the cut-off scores, no women were further considered for the ATSAC position. (Davis Depo at 58-60).

At the time, FAM 【SSI - 49】 applied for and received the ATSAC position in the CVG Field Office. (Doc. #65 at Ex. W). Mr. 【SSI - 49】 was a graduate of the University of Maryland with a degree in Economics. *Id.* He spent seventeen years as an 1801 Inspector with the United States Secret Service, Uniformed Services Division. *Id.* During his employment with the Secret Service, he served as Senior Course Instructor and Firearms Instructor for the Special Operations Training Sector. *Id.* While he was with the FAMs, Mr. 【SSI - 49】 served as an acting or back-up ATSAC for various squad teams and training.[25] *Id.*

---

competitively. Leidner believes that these policies were violated since she had completed a federal supervisory period and still had to compete for the promotion. However, all applicants were reviewed in the same manner. Leidner has not proven that she was the only applicant with prior supervisory experience who was still required to compete for the position.

[25] In 2004, FAM 【SSI -】 was Acting ATSAC for training during the entire calendar year and back-up ATSAC for Squad 4 on an as-needed basis. In 2005, he served as back-up training ATSAC. In 2006, he was the back-up ATSAC for Squad 3, and, beginning April 2, 2006, he was appointed the Acting ATSAC for training. (Doc. #65 at Ex. W).

Mr. [SSI - 49] had experience interviewing suspects, making arrests, executing search warrants, participating in evidence control and the seizure of property, preparing federal complaints and arrest warrants, and testifying at preliminary hearings and trials. *Id.* Mr. [SSI - 49] was an experienced training and firearms coordinator. *Id.* Furthermore, Mr. [SSI - 49] received various honoraria and commendations while employed by the FAMS. *Id.*

Plaintiff also applied for the promotion but did not receive it. Plaintiff did not possess a college degree at the time she submitted her application for th ATSAC position. (Doc. #65 at Ex. X; Leidner Depo, Day 2 at 137). Prior to being a FAM, she was a GS-9 Lieutenant with the Federal Bureau of Prisons[26], a supervisory position she held for just under two years. *Id.* She had also been employed as a Corrections Officer for eight years.[27] *Id.* During her employment with FAMS, she never held an acting or back-up ATSAC position, nor did she have any collateral or ground-based assignments. *Id.* However, for approximately twenty months, she was detailed to the FAMS Mission Operations Center (MOC) as a controller and watch officer. *Id.* In this role, she received experience in flight operations and mission assignments, but this was not a supervisory or managerial position. *Id.* Plaintiff also had experience with interviewing suspects, participating in evidence control and the seizure of property, and testifying at preliminary hearings and trials. *Id.* Leidner did not list any honoraria or commendations on her ATSAC application. *Id.*

In 2006, CVG flying FAMs were eligible for In-Band Pay Increases (IPI) and cash

---

[26] The FAMS does not consider the BOP a law enforcement agency. *See* (Britsch Depo at 118; Davis Depo at 61).

[27] However, Leidner did not have any experience as an 1801 federal investigator. (Leidner Depo, Day 2 at 138).

11

awards. SAC Davis distributed a ten-point chart in order to assess the FAMs' qualities, identifying various objective and subjective criteria.[28] (Doc. #65 at Ex. Y). Leidner challenges the manner in which she was assessed for two of the points: firearms and dependability.[29] (Leidner Depo, Day 2 at 53-54). The firearms score was determined by an objective test, using an average of the FAM's four range scores from the prior twelve months. (SSI - 49 Depo at 30). Leidner's scores for the prior twelve months were 282, 278, 284, and 282, an average of 281.5. (Doc. #65 at Ex. Z). Based on the rating system used for the awards selection, a score of 281.5 received a "3" on a scale of one to five. (Doc. #65 at Ex. Y). The dependability score was based on ATSAC's impression of Leidner's work habits over the past twelve months, including her willingness to take additional flights when asked, use of sick leave and paperwork error rate.[30] (SSI - 49 Depo at 35). After adding Leidner's scores together, she received a combined score of 42.6. (Doc. #65 at Ex. Y). Her score was higher than four male FAMs on her team. Id. The

---

[28] SAC Davis instructed ASAC Britsch to have a meeting with the ATSAC supervisors and establish scores as a group. (Davis Depo at 46). Despite this instruction, ASAC Britsch allowed each ATSAC to individually evaluate and score those FAMs under his or her supervision. Id. A review of the total scores for the CVG Field Office reveals that FAMs on ATSAC SSI - 49 team, as a whole, had lower scores than their fellow FAMs on different teams. See id. at Ex. 2.

[29] Leidner also claimed that ATSAC SSI - 49 review of his team violated section six of the policy and procedures performance agreements and appraisals, since he stated that he rated his team harder than the other ATSACs in the office. (Leidner Depo, Day 2 at 56). Regardless of whether ATSAC SSI - 49 violated this policy, it would not lend credence to Leidner's gender discrimination claim since the male FAMs on her squad were also rated harder than FAMs on other squads.

[30] Time and attendance sheets were a constant problem in the CVG Field Office. SSI - 49 Depo at Ex. 1). Upon review of Leidner's records, ATSAC SSI - 49 found she had an error rate in excess of fifty percent for 2005 and 2006. Id. When compared to her fellow squad members, her error rate was higher than the average of the group. Id. at 22.

Leidner also tries to rebut ATSAC SSI - 49 assessment of her paperwork error rate by submitting an email that ATSAC SSI wrote to her on February 26, 2007 in which he stated that she was "one of the best on [her] paperwork." (SSI Depo at Ex. 5).

12

lowest eligible score for an IPI was 46.3, and the lowest score for a cash award was 45. (Doc. #65 at Ex. AA). Therefore, Leidner was ineligible for either award.

Despite Leidner's denial of an IPI or cash award in 2006, ASAC Britsch[31] nominated Leidner for a different time off award in August 2006.[32] (SSI - 49 Depo at 39-40, Ex. 5). The nomination form stated: "FAM Leidner is *dependable* and professional in her appearance and demeanor. She is courteous and respectful to airline personnel and field office staff. FAM Leidner works very hard on her physical fitness and is always amongst the leaders in the Field Office in Physical Fitness scoring." *Id.* at Ex. 5 (emphasis added). ATSAC (SSI - 49 explained that the time off award "dependability" was based on Leidner's appearance and demeanor, meaning that she always dressed correctly and acted appropriately. *Id.* at 40. However, the IPI and cash awards "dependability" was based on her willingness to take additional flights when asked, use of sick leave and paperwork error rate.[33] *Id.* at 35.

On September 22, 2006, after SAC Davis left the CVG office, Leidner was moved from ATSAC (SSI - 49 team to a new squad. (Doc. #33 at ¶ 18). According to Leidner, this squad was supposedly made up of FAMs who had problems in the past with ATSAC

---

[31] The nomination form states that the recommending official was ASAC Britsch. ▓▓▓ ▓▓ Depo at Ex. 5). However, in his deposition, ATSAC (SSI - 49 stated that it might have been him who nominated Leidner for this award. *Id.* at 40. The record is unclear as to whether Leidner actually received this time off award based on the nomination.

[32] ATSAC (SSI - 49 testified the evaluations for the IPI or cash awards were likely done in July 2006. (SSI - 49 Depo at 39). However, Leidner was not informed that she did not qualify for an IPI or cash award until September 6, 2006. *Id.* at Ex. 1. Leidner received the nomination for her time off award on August 18, 2006. *Id.* at 39.

[33] After reviewing the August nomination form and the July evaluation, it does not appear that the two are contradictory. Leidner was commended for her appearance and demeanor in August. (SSI - 49 Depo at Ex. 5). On the July evaluation, she received above average scores in the categories of: attitude, interpersonal skills, organizational skills, communication, appearance, and professionalism. *Id.* at Ex. 2.

13

(SSI - 49 and ASAC Britsch. (Leidner Depo, Day 2 at 88). However, the majority of FAMs at the CVG Field Office were also reassigned to a different squad at this time. *Id.* at 90.

During 2006 and 2007, Plaintiff alleges she was flying all five days of the week, with the exception of one or two ground training days per roster period.[34] (Leidner Depo, Day 1 at 101). Plaintiff also alleges she was getting less training days than the male FAMs at this time. *Id.* at 100-102, 109. However, a FAMS Report showed that between January 1, 2003 and August 15, 2009, Leidner had 58 non-mission status (NMS) and 106 training days. (Doc. #65 at Ex. P). The office average during the same time period was 51 NMS and 109.2 training days. *Id.* Furthermore, Leidner asserts that she received less international trips than her male counterparts. The records do not support her contention. Between January 2003 and August 2009, Leidner was ranked ████████ CVG FAMs in international trips taken, logging ███ flights for a total of ███ ound trips.[35] (Docs. #65 at Ex. N; #77 at Ex. LL)

Leidner also contends she did not receive as many holidays off as her male counterparts.[36] (Leidner Depo, Day 3 at 70, Ex. 37). However, Leidner also testified that

---

[34] A roster period is every twenty-eight (28) days. (Leidner Depo, Day 1at 101).

[35] While these statistics were gathered from January 1, 2003 to August 15, 2009, Leidner's trip calculation did not even begin until she returned from TDY. (Leidner Depo, Day 1 at 118). Leidner believes this information to be inaccurate, although she has no knowledge of how many international flights she actually took nor has she produced any evidence to refute the Defendant's information. *Id.* at 119.

[36] Leidner bases her argument on a purported "Holiday Off Roster" that she testifies she retrieved off a "drive" from a work computer. However, she cannot specifically recall where she obtained the document, who prepared the document, where or when the document was prepared, what source materials were used in the preparation of the document, and for what purpose the document was prepared. (Leidner Depo, Day 3 at 70-71). Furthermore, Leidner does not have a specific recollection of the holidays off she received. When asked whether she would be surprised to find out that the Roster was incorrect, she stated: "Like I told you earlier, this came off of the computer at work. So it's only as accurate as what the work, whoever put this together." *Id.* at 80.

Leidner also presented an email she wrote to ATSAC (SSI) on December 27, 2006 in support of her

14

she requested to work certain holidays. *Id.* at 72. At the end of 2006, the office needed additional people to volunteer for some international trips that came in, and Leidner volunteered to work Christmas Day even though she was scheduled to be off.[37] *Id.* at 72-73, 76-77. Additionally, Leidner specifically requested to work New Year's Day in 2007 since she knew there were other FAMs who wanted that day off, and she "was willing to work for them." *Id.* at 73, 76-77. *See also* (SSI - Depo at Ex. 3).

Leidner first contacted an EEO counselor on October 13, 2006 to file a claim. (Leidner Depo, Day 1 at 106). On December 28, 2006, Plaintiff filed her formal charge with the TSA Office of Civil Rights against Acting SAC Britsch and ATSAC (SSI - 49) Doc. #33 at ¶ 19). The complaint alleged sexual discrimination, a hostile work environment, age discrimination, multiple instances of gender discrimination and equal pay. *Id.* at ¶ 20. On January 10, 2007, Inquiry Officers ASAC (SSI - 49 CFR 1520.5) and ATSAC (SSI - 49 CFR 1520.5) (SSI - were appointed to conduct an administrative inquiry of Leidner's allegations and to determine whether FAMS management was involved in or failed to act upon these allegations. (Doc. #65 at Ex. F). Inquiry Officers met with Leidner to discuss her allegations and, based upon the information provided, interviewed nine employees at the CVG Field Office, including ATSAC (SSI - and ATSAC (SSI - 49) *Id.* As a result of the

_____

argument. *See* (SSI - Depo at Ex. 3). In that email she claims: "The holidays I requested in [2006] were not granted." *Id.* However, Leidner never offers any proof that she actually requested certain holidays off in 2006

Furthermore, in a later email that Leidner sent to ATSAC (SSI - 49) she explained that she never requested those holidays off, but rather she was scheduled to be off the Fourth of July, Christmas Eve, and Christmas Day in 2006. *Id.* at Ex. 4. In fact, Leidner admits that at that particular time FAMs were not required to submit leave slips for those particular holidays. *Id.* Subsequently, Leidner was scheduled to work on the Fourth of July and the Christmas Day. *Id.* However, Leidner *volunteered* to work over the Christmas holiday when London trips came in. *Id.*

[37] However, due to a passport issue, Leidner actually flew domestic missions instead. (SSI Depo at Ex. 4).

15

interviews, the Inquiry Officers were able to substantiate that rumors about Leidner had circulated among some individuals, and the likely sources of those rumors were FAMs[SSI - and [SSI - 49] *Id.* When Leidner confronted the individuals, the rumors had subsided. *Id.* By her own admission, Leidner never brought the problems to the attention of management. *Id.* While FAM[SSI -] advised ATSAC[SSI -] of a problem between he and Leidner, he later told management that it had been resolved. *Id.* Therefore, the Inquiry Officers concluded that there was no evidence to indicate that FAMS management had knowledge of or failed to act on any of Leidner's allegations. *Id.* FAMs[SSI - 49 CFR] were subsequently disciplined for the spreading of rumors and both received letters of counsel. (Doc. #77 at Ex. II).

Leidner also claims she was subject to retaliation after filing her EEO complaint. During a February 13, 2007 meeting with FAMs and CVG management, ATSAC[SSI -] told Plaintiff and those in attendance to "[b]e careful [sic] what battles you pick. You may win the battle but will lose the war."[38] (Doc. #33 at ¶ 22). While Plaintiff could not see what [SSI - 49] was holding in his hand when he said this, she believed it to be her EEO complaint, although there is no evidence establishing that fact. (Leidner Depo, Day 3 at 95-96). Additionally, all FAMS were required to stay later on training days, supposedly because EEO complaints had been filed.[39] *Id.* at 94. Following this meeting, CVG management

---

[38] Leidner alleges ATSAC[SSI -] was looking directly at her when he made this comment. (Leidner Depo, Day 3 at 96). ATSAC[SSI -] testified that he did make this comment, but he was referring to the Fair Labor Standards Act (FLSA) lawsuit going on at that time. [SSI -] Depo at 93-94). He stated, "I would hate for [the FAMs involved in the lawsuit] to win the battle and lose the war and lose their lead that is ultimately going to affect their retirement." *Id.* at 94.

[39] Leidner testified that a fellow FAM, who she could not remember, told her that management was telling coworkers that FAMs had to stay later on training days because of EEO complaints being filed. (Leidner Depo, Day 3 at 94).

16

began meeting with FAMs to discuss Leidner's charges and cautioned FAMs that they may be called as witnesses. (SSI - 49 CFR 1520.5 Depo at 22-23, 28). During this time, Leidner also alleges the number of FAMs getting written up for infractions or violations increased.[40] (Leidner Depo, Day 3 at 39-40). On March 14, 2007, Plaintiff filed a Notice of Retaliation with the TSA Office of Civil Rights. (Doc. #33 at ¶ 26).

In May 2007, FAMS Headquarters notified CVG management that it received an anonymous complaint against Plaintiff in February 2007, claiming that Leidner was in violation of Kentucky's vehicle registration laws. (Docs. #33 at ¶ 27; #65 at Exs. DD, EE). CVG management notified Plaintiff of the complaint and that she would be investigated. (Doc. #33 at ¶ 27). Leidner informed management that she did not own the vehicle in question, and she was cleared of any wrongdoing and did not receive any disciplinary action.[41] (Leidner Depo, Day 2 at 113). The matter was then closed.[42] (Doc. #65 at Ex. EE).

Furthermore, in May 2009, Leidner had another investigation opened concerning two three-year old travel voucher mistakes, both amounting in a $109.00 deficiency. (Doc. #51-

---

[40] Leidner alleges that several FAMs told her that ATSAC (SSI - 49) told them that more FAMs were being written up because EEO complaints were being filed. (Leidner Depo, Day 3, 39-40). However, Leidner never heard ATSAC (SSI - 49) say this firsthand.

[41] Leidner was verbally counseled to comply with state vehicle registration and licensing guidelines. Such a verbal counseling is not considered a formal disciplinary action against an employee. (Doc. #65 at Ex. EE).

[42] Leidner claims that the investigation was never closed. Leidner asserts that ASAC Britsch testified that the investigation is still pending on Leidner's record. See (Britsch Depo at 134-135). Since this investigation is still pending, Leidner contends that she cannot transfer, be promoted or receive any awards. (Doc. #72 at Ex. 5 ¶ 13).

Defendant argues that the matter was closed. (Doc. #65 at Ex. EE). Furthermore, Leidner was eligible to receive awards, promotion and transfer and, indeed, did receive a two percent IPI in March 2008, one year after the anonymous complaint was received and six months after the investigation was closed. (Doc. #65 at Ex. MM).

17

3). Leidner was called into the office after initially being told that she was simply a witness to the investigation. (Leidner Depo, Day 2 at 34-35). She was given a Garrity Warning to sign and was then asked to write a statement. *Id.* at 35, 47-49. Leidner stated that she stood by her statement previously made in April 2008; she could not remember the exact details at this time because it happened almost three years ago. *Id.* at 35. The investigator kept pressing Leidner to write another statement and, according to Leidner, after feeding her some incorrect facts, she wrote another statement. *Id.* at 35-36, 42-43. After doing so, the investigator told Leidner that she had now falsified two statements and was going to be referred to the U.S. Attorney for prosecution. *Id.* at 37. On December 24, 2009, Leidner was issued a letter from the TSA's Office of Security, Personnel Security Division notifying her of the intent to revoke her security clearance. (Doc. #51-3). While her security clearance was pending, Leidner was placed on administrative leave without pay. *Id.* At oral argument, Plaintiff's counsel notified the Court that since the filing of Defendant's Motion for Summary Judgment, the investigation has been dropped, and Leidner and her security clearance have been reinstated.

According to Leidner, CVG managers and TSA have also intimidated witnesses who have testified in her favor. *See* (Doc. #72 at Ex. 18b-g.) FAM [SSI - 49 CFR 1520.5] was offered his desired transfer to the Dallas office, that was previously unavailable, right before his deposition in this case. (Doc. #72 at Ex. 18d). However, after he testified favorably for Leidner, the transfer offer was revoked. *Id.* Moreover, after his testimony, [SSI - 49] was investigated for a travel voucher overpayment from a year earlier. *Id.* FAM [SSI - 49 CFR 1520.5] was pulled from his duties six times to be interviewed by TSA attorneys and investigators about the alleged incident that occurred at his going away party in 2005. (Doc. #72 at Ex.

18

18e). TSA investigators also threatened to tell FAM <span>SSI - 49 CFR</span> family about his alleged affair with Leidner. *Id.*

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d

19

1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

It is well settled that the court may only consider admissible evidence when ruling on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Therefore, hearsay evidence must be ignored. *Id.* (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)). Likewise, unauthenticated documents cannot be considered. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). However, there is no requirement that a party produce the evidence in a form that would be admissible at trial. *Celotex Corp.*, 477 U.S. at 324. "[T]he party opposing summary judgment must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558 (emphasis in the original).

## B. Title VII

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, prohibits employment discrimination on the basis of race, color, religion, sex and national origin and is the sole remedy for such actions in federal employment. 42 U.S.C. § 2000e-2; *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 828-35 (1976). Two types of actions may be brought: (1) discrete discriminatory acts and (2) claims alleging a hostile work environment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Examples of discrete discriminatory acts include termination, failure to promote, denial of transfer or refusal to

20

hire. *Id.* at 114. Hostile work environment claims are different than discrete discriminatory acts, because hostile work environment claims involve repeated conduct that occurs over a period of time. *Id.* at 115. These claims are based on the "cumulative effect of individual acts" that would otherwise not be actionable on their own. *Id.*

The right to bring a Title VII action in the federal government is "predicated upon the timely exhaustion of administrative remedies . . . ." *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991). Failure to comply with the regulations is grounds for dismissal of the discrimination claims. *Id.* Federal employees who believe they have been discriminated against on the basis of race, color, religion, gender, national origin, age, disability, or genetic information must initiate contact with an EEO Counselor within forty-five days of the date of the incident alleged to be discriminatory. 29 C.F.R. § 1614.105(a)(1). Defendant argues that Leidner failed to exhaust her pre-October 2006 hostile work environment claims, because she did not contact an EEO counselor until October 1, 2006.

Despite Defendant's contention, the administrative time requirement is not a jurisdictional prerequisite and is subject to waiver, estoppel and equitable tolling. *Steiner v. Henderson*, 354 F.3d 432, 436 (6th Cir. 2003) . Furthermore, the Sixth Circuit has held where a continuing violation exists, the series of acts may be challenged as long as one of the discriminatory acts occurred within the limitations period. *McFarland v. Henderson*, 307 F.3d 402, 406-07 (6th Cir. 2002) (citing *Alexander v. Laborers' Int'l Union*, 177 F.3d 394, 408 (6th Cir. 1999)). A continuing violation exists where the plaintiff endures either "(1) a series of discrete discriminatory acts that are anchored by at least one such act within the limitations period, or (2) where there has occurred a 'longstanding and demonstrable ... over-arching policy of discrimination.'" *Id.* at 406 (quoting *Dixon v.*

21

*Anderson,* 928 F.2d 212, 216-17 (6th Cir. 1991)). The Sixth Circuit has also found that since the very nature of a hostile work environment involves repeated conduct, a hostile work environment claim, thus, has a similar effect to a continuing violation composed of successive discrete acts. *McFarland,* 307 F.3d at 408 (quoting *Nat'l R.R. Passenger Corp.,* 536 U.S. at 115). Therefore, Leidner's EEO complaint was timely if it was part of the same unlawful employment practice, i.e., a hostile work environment, that existed less than forty-five days before her initial contact with the EEO counselor. *Id.*

Leidner first contacted the EEO counselor on October 1, 2006. Therefore, forty-five days prior to the initial contact was August 28, 2006. The harassing conduct was alleged to have started on or about February 2005 with the stripping rumor and rumors regarding Leidner's supposed affairs with married male FAMs. In her initial contact with the EEO counselor Leidner stated the harassment had continued through September 22, 2006. A review of her original Complaint (Doc. #1) reveals that this is the date on which Leidner was transferred to a new squad of supposed "problem" FAMs. Further, the record reveals that a genuine issue of fact exists to whether the stripping and affair rumors were still circulating at this time. Therefore, Leidner did not fail to exhaust her administrative remedies since the alleged harassing conduct existed forty-five (45) days before Leidner initiated contact with the EEO Counselor.

### C. Hostile Work Environment

Title VII prohibits sexual harassment caused by a hostile work environment. *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 560 (6th Cir. 1999). To establish a prima facie case of a hostile work environment based on sex, the plaintiff must prove: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the

harassment was based on her sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable. *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Williams*, 187 F.3d at 560-61). Plaintiff contends that multiple incidents contributed to the alleged hostile work environment. Defendant does not dispute that Plaintiff meets the first two requirements–Plaintiff is a protected class member who was subject to unwelcome harassment. However, Defendant argues that the alleged harassment was either not based on Plaintiff's sex or not severe or pervasive to create a hostile work environment. Furthermore, Defendant contends Plaintiff has not established that Defendant is vicariously liable for the harassment.

### 1. Harassment "Based on Sex"

It is well settled that Title VII does not prohibit all verbal or physical harassment in the workplace, but only such harassment that is based on sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). However, harassment can be "based on the employee's sex" even though the nature of the conduct is non-sexual, as long as it expresses anti-female animus and contributes significantly to the abusive environment. *Williams*, 187 F.3d at 565 (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988). Therefore, any unequal treatment *"that would not occur but for the employee's gender* may, if sufficiently severe or pervasive ..., constitute a hostile work environment in violation of Title VII." *Id.* (emphasis in original). Leidner alleges a number of non-sexual incidents contributed to her hostile work environment claim. However, she has failed to present evidence that the incidents express anti-female animus or would not have occurred but for her gender.

23

First, Leidner contends that her September 22, 2006 transfer to a new squad was harassing conduct based on her sex. Despite this contention, she has presented no evidence that she was transferred to the new squad simply because she was a woman. Indeed, the record shows that management reorganized the entire CVG Field Office at that time, and most FAMs were transferred to new squads. Furthermore, Leidner believes her new squad consisted of FAMs who had problems with either ASAC Britsch or ATSAC ██████ directly refuting any argument that she was transferred to the new squad because of her sex.

Leidner also argues that she was subject to sexually harassing conduct when male FAMs spoke about visiting red light districts overseas. Regardless of the fact that Leidner has not presented any evidence that she even heard or had knowledge of these conversations, she has also failed to present any evidence that these conversations were sexual in nature. Furthermore, the mere fact that FAM Slaughter was arrested for imprisoning a prostitute while visiting a red light district is wholly irrelevant to the present case. This was an isolated incident, and the record is devoid of any evidence that it was discussed in Leidner's presence or that Slaughter's behavior was condoned or encouraged by CVG management.

Finally, Leidner asserts that the "dysfunctional" management of the CVG Field Office contributed to her hostile work environment claim. She claims individual members of management differed on policy interpretation, and FAMs would approach different supervisors with the same question and receive different answers. Furthermore, the hostility between the individual supervisors led to a abusive and chaotic environment. However, Leidner has presented no evidence that this alleged dysfunction had anything

24

to do with her gender. Several FAMs testified concerning their individual problems with CVG management. Therefore, the Court concludes that the September 22, 2006 transfer, conversations about visiting red light districts, and the alleged dysfunction of the CVG Field Office were not based on Leidner's sex and, therefore, are insufficient to establish the "based on sex" element of her prima facie case of a hostile work environment.

## 2. Severe or Pervasive

A hostile work environment is found when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Conduct that is merely offensive will not suffice. *Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 459 (6th Cir. 2004). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). Additionally, the harassment should be ongoing, rather than mere isolated or sporadic incidents. *Allen v. Mich. Dep't. of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999).

Two tests must be met to prove a hostile work environment—both a subjective and an objective test. *Harris*, 510 U.S. at 21-22. The conduct must be so severe that a reasonable person would find it abusive, and the victim must also subjectively regard the environment as abusive. *Id.* Furthermore, the Court must consider the totality of the circumstances when evaluating whether the alleged harassment is so severe and pervasive

25

to establish a hostile work environment. *Williams*, 187 F.3d at 560-61 (citing *Harris*, 510 U.S. at 23). The Court should not decide whether each incident, standing alone, is sufficient to constitute a hostile work environment, but rather whether the incidents, taken as a whole, are sufficient to sustain a claim. *Id.* In doing so, the Court may consider the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

In the present case, Leidner has claimed several incidents contributed to the alleged hostile work environment in the Cincinnati Field Office. Leidner contends that several rumors were circulating around the office that she was having affairs with FAMs (SSI - 49 CFR 1520.5)
(SSI - 49 CFR 1520.5) . In February 2005, a rumor was also spread that Leidner had stripped for FAM (SSI - 49 CFR 1520.5) at his going away party. At this same party, FAM (SSI) questioned Leidner about her breasts and whether she had breast augmentation surgery. Plaintiff has also alleged that male FAMs referred to women as "bitches" and "whores" and made inappropriate comments about female airline passengers in front of her. Evidence has been presented that some male FAMs commented they did not believe women should be FAMs and did not want to fly with Leidner because she was a woman. Defendant argues that this alleged harassment was not severe or pervasive enough to constitute a hostile work environment. The Court agrees.

Plaintiff has failed to prove a prima facie case of hostile work environment based on sex because she has not shown that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions

of her employment and create an abusive working environment. The record establishes that there were rumors being spread about Leidner having affairs with certain male FAMs, in addition to the stripping rumor. However, Plaintiff has also failed to produce any evidence that these rumors were ever said in her presence or directed towards her. Furthermore, she has not produced any evidence that fellow FAMs actually believed these rumors.

Only one sexual comment was ever made to Leidner concerning her breasts. As to the comments regarding certain females or females in general, no one ever directed these comments specifically at Leidner, and she has not presented any testimony that she had knowledge of such information at the time she was working. While sex-based comments do not need to be directed at a plaintiff in order to constitute a hostile work environment, if most of the comments were not directed at the plaintiff, it supports the conclusion that the conduct was not severe or pervasive enough to create an objectively hostile work environment. *Knox*, 375 F.3d at 459 (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). Finally, Plaintiff has presented no evidence, beyond her conclusory allegations, that any of the alleged objectionable conduct interfered with her work performance.

"Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are not sufficient to establish liability." *Clark*, 400 F.3d at 352 (citing *Faragher*, 524 U.S. at 788). Courts have held that sexually suggestive comments and vulgar remarks are generally not enough to create an objectively hostile work environment. *See Black*, 104 F.3d at 826 (6th Cir. 1997); *see also Richards v. Dep't. of Army*, 2007 WL 579549, No. 05-1091, at *5 (6th Cir. 2007)

(Court did not find hostile work environment where supervisor referred to bell curves on a chart as resembling "a pair of woman's tits" and spoke to individuals "about women's body parts" in general and Plaintiff's body parts in particular, as this was nothing other than isolated examples of boorish behavior). From early 2005 until late 2006, Leidner has shown that she was subject to rumors that she was having affairs with male FAMs and one rumor that she had stripped for a fellow FAM at a going away party. She has also shown that FAM ███ made one comment concerning her breasts, and other FAMs have occasionally made inappropriate comments to her concerning other women or women in general. Clearly, these are isolated incidents that fail to establish her working environment was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment.

Plaintiff cites *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009) in support of her proposition that the CVG Field Office permitted a sexually charged work environment that was hostile to women. In *Gallagher*, the plaintiff described the office atmosphere as a "guy's locker room." *Id.* at 267. The employees worked in cubicles with short divider walls on an open floor plan. *Id.* at 266. Conversations were readily overheard, and computer screens were visible to others. *Id.* Male employees frequently referred to female customers and co-workers as "bitches, whores, sluts, dykes and cunts." *Id.* at 267. Male co-workers also specifically referred to the plaintiff as a "heifer" with "milking udders" and "moo"ed when she walked by. *Id.* Male and female co-workers viewed sexually explicit pictures on their computers, and male co-workers left pornographic magazines lying open on their desks. *Id.* Certain male employees brought in nude photographs of their girlfriends and shared them with other male co-workers. *Id.* Several

28

male co-workers made sexual jokes and graphically discussed their sexual liaisons, fantasies and preferences in front of the plaintiff. Id. Moreover, plaintiff was forced to voice her complaints to the supervisor at his work station in front of the other employees. Id. The supervisor would often yell aloud at the offending employee to stop the behavior because it offended the plaintiff, which subjected her to even more ridicule. Id.

Gallagher is easily distinguishable for several reasons. First, the conduct Leidner complains of is not nearly as egregious as the conduct in Gallagher. Additionally, unlike the plaintiff in Gallagher, Leidner was not subject to this behavior on a regular basis, as she only worked out of the CVG Field office three or four times a month. Finally, Leidner never complained to management about the alleged harassing behavior. Therefore, the Court concludes that Plaintiff has failed to establish a prima facie case of a hostile work environment. However, even if the Court were to conclude that the alleged incidents were severe or pervasive enough to establish a hostile work environment, Plaintiff has failed to prove that Defendant was vicariously liable for the sexual harassment.

### 3. Employer Liability

Determining whether the employer is vicariously liable depends on whether the harasser is a co-worker or a supervisor of the victim. Clark, 400 F.3d at 348. When the harasser is a co-worker, the employer is liable if it knew or should have known of the sexual harassment and failed to take prompt and appropriate corrective action. Id. (citing Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir. 1999)). When the employer responds with good-faith remedial action, it can be liable for discrimination only if that remedy exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination.

29

*Weigold v. ABC Appliance Co.*, 105 F. App'x 702, 710 (6th Cir. 2004) (citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)). In other words, an employer is liable only if it does not respond in a "reasonable" manner. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999).

On the other hand, "an employer is vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). Thus, the employer is essentially strictly liable when the harassing is done by a supervisor. *Clark*, 400 F.3d at 348.

### a. Supervisor Harassment

Plaintiff has only presented evidence of one incident involving a supervisor. In 2003, ATSAC [SSI-] supposedly reported to SAC Davis that Leidner was having an affair with FAM [SSI-]. However, the record is unclear as to how the exact conversation took place. ATSAC [SSI-] testified that he overheard FAMs talking about FAMs [SSI-] and Leidner, stating that FAM [SSI-] was attempting to date Leidner while they were on TDY in Atlantic City. Upon hearing this, ATSAC [SSI-] told SAC Davis, with the emphasis being on [SSI-] not Leidner. On the other hand, SAC Davis testified that ATSAC [SSI-] simply stated that Leidner and [SSI-] were having an affair. ATSAC [SSI-] did not believe this information was credible and refused to look into the matter. Regardless of whose testimony is most accurate, this was merely one isolated incident in which a supervisor may have been involved with the spreading of a rumor. The Sixth Circuit has made clear that in order to state a valid hostile work environment claim, the harassment must be ongoing. *Allen*, 165 F.3d at 411. Furthermore, the incident took place in 2003, prior to Leidner's

30

present hostile work environment claim which only involves incidents beginning in February 2005. While Leidner testified she was made aware of the rumor in 2004, she has presented no evidence that the rumor circulated throughout the office in 2005. Therefore, Defendant is not vicariously liable for one incident involving a supervisor that took place prior to February 2005.

## b.    Co-worker Harassment

The record is clear that Plaintiff never notified CVG management of the alleged harassing conduct she was experiencing from her fellow male FAMs. Furthermore, Plaintiff has presented little evidence that CVG management had knowledge of the alleged stripping and affair rumors before she filed her EEO Complaint. However, Plaintiff has shown that a question of fact exists to whether management knew about the SSI - 49 CFR affair rumors, and, therefore, the Court will assume that ATSAC SSI had knowledge of such rumors and shared this information with the other supervisors.

ATSAC SSI testified that when FAM SSI contacted him about the rumors, he first told FAM SSI to contact Leidner and attempt to work through the issue. If that was unsuccessful, ATSAC        stated he would be more than willing to intervene in the matter. Only a few days later, FAM SSI told ATSAC SSI that the matter was resolved, and, therefore, ATSAC SSI did not investigate further. As stated above, Leidner never came to anyone in management to discuss the rumors that FAM SSI was allegedly spreading. Leidner argues that she told SAC Davis about the need for in-person ethics training; however, she never specified that she was experiencing sexual harassment. Moreover, the record establishes that FAMS employees had mandatory online sexual harassment training and occasionally received in-person training. The Court finds that

31

management's response to the affair rumors was reasonable given the little information it had at the time. *See Birone v. Indian River Sch.*, 145 F.3d 1329, at *4 (6th Cir. 1998) (unpublished) (the failure of management to quell rumors and idle gossip, especially that of an alleged office romance, is usually not sufficient to impute liability to an employer).

The record establishes that management also had knowledge of inappropriate incidents involving male FAMs and female flight attendants. Management learned that two male FAMs had been soliciting dates from female flight attendants. In response, one FAM was given a verbal warning and letter of counsel. The other FAM voluntarily resigned as he had previous conduct issues. The record also establishes that management was aware that flight attendants were making complaints about FAMs. However, the record does not establish whether the complaints were made by female flight attendants and what the specific nature of the complaints were. Management responded by discussing the complaints in training sessions and advised FAMs to be professional and not cause any problems with the flight attendants. Thus, when notified of a problem, CVG management took affirmative action and responded appropriately to the alleged harassment.

Once Leidner finally reported the alleged incidents and filed her EEO Complaint, TSA began an immediate investigation. Inquiry Officers ASAC [SSI - 49] and ATSAC [SSI - 49 CFR] were appointed to conduct an administrative inquiry of Leidner's allegations and determine whether FAMS management was involved in or failed to act upon these allegations. Inquiry Officers met with Leidner to discuss her allegations and, based upon the information provided, interviewed nine employees at the CVG Field Office, including ATSAC [SSI - 49 CFR] and ATSAC [SSI - 49 CFR] As a result of the interviews, the Inquiry Officers were able to substantiate that rumors about Leidner had circulated among some

32

individuals, and the likely sources of those rumors were FAMs ███████████ By her own admission, Leidner never brought the problems to the attention of management. While FAM ████ advised ATSAC ████ of a problem between he and Leidner, he later told management that it had been resolved. Therefore, the Inquiry Officers concluded that there was no evidence to indicate that FAMS management had knowledge of or failed to act on any of Leidner's allegations. FAMs ███████████ were subsequently disciplined for the spreading of rumors and both received letters of counsel. Defendant's investigation was a good-faith remedial response to Plaintiff's allegations, and consequently, Defendant is not vicariously liable for the alleged co-workers' harassment.

## D.    Gender Discrimination

A plaintiff can establish a claim of gender discrimination under Title VII by producing either direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (quoting *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)). When a plaintiff seeks to prove gender discrimination based on indirect evidence, the Court applies the well-recognized burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Under the *McDonnell Douglas* test, the plaintiff must first establish a prima facie case of gender discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. The burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the employment decision. *Id.* Finally, if the employer sets forth such a reason, the plaintiff must show that the nondiscriminatory reason was in fact pretext. *Id.* at 804.

To establish a prima facie case of gender discrimination, the plaintiff must prove that: (1) plaintiff was a member of a protected class; (2) plaintiff suffered an adverse

33

employment action; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Vincent*, 514 F.3d at 494 (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). If the plaintiff alleges she was treated differently than employees outside the protected class, rather than being replaced, she must show "situational similarity" to the more favorably treated employees. *Id.* at 496 (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1247 (6th Cir. 1995)). This requires the plaintiff to prove that the relevant aspects of plaintiff's employment situation are almost identical to those of the non-protected employees. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The employment action must amount to a materially adverse change in the terms or conditions of employment to be actionable. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). *De minimis* employment actions are not materially adverse. *Bowman*, 220 F.3d at 462. The action must be more than a "mere inconvenience or alteration of job responsibilities." *Id.* at 461-62.

Leidner points to multiple instances of alleged discrimination to show that she was treated differently than the male FAMs in the CVG Field Office including: (1) On September 22, 2006, Leidner was transferred to a squad made up of "problem" FAMs; (2) Leidner worked more holidays than any other FAM; (3) Leidner was routinely denied collateral

34

assignments that would enhance her career; (4) Leidner received fewer international flights to desired destinations than other male FAMs; (5) Leidner was denied awards and pay increases; (6) Leidner was not promoted to ATSAC; and (7) Leidner was subjected to closer scrutiny than fellow male FAMs.

As an initial matter, Leidner has failed to exhaust her administrative remedies with respect to the claim that she was subject to closer scrutiny than other male FAMs. In support of this claim, Leidner offers evidence of the vehicle registration and travel voucher investigations–the very same instances that make up her retaliation claims. However, to bring a Title VII action in federal court, the Plaintiff must have exhausted all of her administrative remedies. *Benford v. Frank*, 943 F.2d 609, 612 (6th Cir. 1991). This requires strict compliance with the procedures and time limitations set forth in the regulations. 29 C.F.R. § 1614.106 states that when an individual files an EEO complaint, she "must ... describe generally the action(s) or practice(s) that form the basis of the complaint." Plaintiff has never filed a gender discrimination complaint concerning these matters with the TSA Office of Civil Rights. Rather, she has only alleged that these investigations were in retaliation for the filing of her EEO Complaint on December 28, 2007. *See* (Doc. #77 at Ex. JJ). Therefore, this claim must be dismissed. Furthermore, even if the Court were to consider this additional gender discrimination claim, it would fail because Plaintiff has not presented any evidence that similarly situated males were treated more favorably.

With respect to the balance of Plaintiff's gender discrimination claims, the parties do not dispute that Leidner was a member of a protected class and that she was qualified for her position as a FAM. However, the parties dispute whether the complained of allegations are adverse employment actions or if similarly situated males were treated more favorably.

35

## 1. September 22, 2006 Squad Transfer

After SAC Davis left the CVG Field Office, the new temporary management team reorganized all FAM squad teams. A new squad was formed, including Leidner, that she contends was made up of "problem" FAMs who had issues with ATSAC [SSI - 49] and/or ASAC Britsch. However, this allegation fails to establish a prima facie case of gender discrimination because it was not an adverse employment action. The employment action must amount to a materially adverse change in the terms or conditions of employment to be actionable. *Kocsis*, 97 F.3d at 885. Plaintiff has submitted no evidence that any aspect of her employment changed or that she suffered any adverse effects as a result of the transfer to a new squad. *See Kasprzak v. DaimlerChrysler Corp.*, 431 F. Supp. 2d 771, 777 (N.D. Ohio 2005) (citing *Walker v. Nat'l Revenue Corp.*, 43 F. App'x 800, 805 (6th Cir. 2002)) (holding that transfers intended to respond to and resolve an employee's problems with another employee do not constitute adverse employment action). Furthermore, Plaintiff has not submitted any evidence that similarly situated male FAMs were treated more favorably. The evidence reveals that the entire CVG Field Office was reorganized at that time and many male FAMs were placed on a new squad. Therefore, Plaintiff has failed to prove a prima facie case of gender discrimination with respect to the September 22, 2006 squad transfer.

## 2. Holidays

Plaintiff claims that she worked significantly more holidays than her male colleagues. In her Response to Defendant's Motion for Summary Judgment, she claims that she is entitled to four holidays per year. (Doc. #72 at 22). However, in her deposition, Plaintiff

36

testified that she was not entitled to receive a certain number of holidays off per year. (Leidner Depo, Day 1 at 146). Therefore, it is unclear whether she claims that she did not receive the holidays off she requested or that she was wrongfully denied holidays altogether. This distinction is critical to determine whether Plaintiff has suffered a material adverse employment action. *See Figueroa v. New York City Health & Hosps. Corp.*, 2007 WL 2274253, No. 03-CV-9589, at *4 (S.D.N.Y. Aug. 7, 2007) (holding that unfavorable work schedules are insufficient to establish adverse employment action, since they do not have a material impact on the terms and conditions of the employment). *Cf. Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir. 1998) (holding that the denial of vacation days qualifies as an adverse employment action because it was a material change in one of the employee's existing employment benefits as she had specifically bargained for paid leave on all federal holidays in her employment contract). However, regardless of the specific nature of Plaintiff's claim and whether it would constitute an adverse employment action, it still fails in several respects.

Most importantly, Plaintiff has not presented any credible evidence to support her allegation that she was required to work more holidays than her fellow male FAMs. The only evidence Plaintiff has presented in support of this allegation is a "Holiday Off Roster" she obtained from a work computer. However, Leidner cannot specifically recall where she obtained the "Holiday Off Roster", and she does not know who prepared the document, where or when the document was prepared, what source materials were used in the preparation of the document, or for what purpose the document was prepared. Leidner also admitted that she does even not know if the document is accurate. Given that the "Holiday Off Roster" is inadmissible hearsay and unauthenticated, it cannot be considered

37

by the Court in ruling on Defendant's summary judgment motion. Leidner also does not have her own specific recollection of the holidays off she received. Furthermore, she admitted that she has requested to work or made herself available on certain holidays if other FAMs wanted particular holidays off.

However, even if the Court were to consider the "Holiday Off Roster", Leidner has not put forth any evidence to prove that all employees listed on the document are similarly situated male FAMs who, depending on the specific nature of her claim, either (1) received more requested holidays off than Leidner or (2) received the four holidays off to which they were entitled. The roster certainly does not detail what holidays each FAM requested and whether that request was granted. Furthermore, if FAMs were indeed entitled to four holidays per year, the roster reveals that not every other FAM received four annual holidays off, buttressing Leidner's argument that male FAMs were treated more favorably than her. Consequently, Plaintiff has not established a prima facie case of gender discrimination and her claim that male FAMs received more holidays off cannot survive summary judgment.

### 3. Collateral Assignments

Leidner contends that she was never selected for collateral assignments or placed in a training position. She claims these positions are essential to her career, as performance in such positions is considered when evaluating FAMs for promotions and pay increases. Prior to 2003, the positions were appointed by management. However, since 2003, CVG management posts announcements when ground based assignments are available, and FAMs may then apply for the positions. (Ratterman Depo at 52).

Leidner has not submitted any evidence that she ever applied for one of these positions and that her application was denied. In fact, since January 2006, training staff

announcements were posted four times (twice in 2006 and twice in 2007), and Leidner never submitted an application for any of the openings. (Doc. #77 at Ex. KK). Moreover, in 2007, ATSAC[SSI - ] asked Leidner if she was interested in a permanent or a temporary ground based liaison position. (Leidner Depo, Day 3 at 61). However, Leidner did not accept the position because she was going to school and needed the computer time. *Id.* Therefore, Leidner has presented no competent evidence to support her allegation that she was never selected for collateral or ground-based assignments, because she has failed to present evidence that she actually applied for such positions.

A Joint Terrorism Task Force (JTTF) position opened up in February 2007, but the position was limited to FAMs who had completed a civilian law enforcement academy. This requirement disqualified Leidner from applying for the position.[43] Plaintiff alleges that the prior law enforcement academy requirement was discriminatory. However, this argument is simply without merit. The CVG Field Office applied this requirement to all FAMs, not just Leidner. In fact, all FAMs in the CVG Field Office who are serving or have served on the JTTF have had some kind of law enforcement background or training. [SSI - 49 ] Depo at 52). Leidner has failed to offer any evidence that this requirement was specifically enacted to exclude her from the position and, thus, any discrimination claim based on the JTTF requirement will be dismissed.

## 4. International Flights

Leidner alleges that she received fewer international flights to so-called desired

---

[43] The BOP is not considered to be a law enforcement academy by the FAMS. (Britsch Depo at 118; Davis Depo at 61). According to former SAC Davis, the BOP was reviewed by FAM Human Resources Personnel who advised that BOP positions were not considered law enforcement. (Davis Depo at 61).

destinations than her fellow male FAMs. Certain international destinations have higher per diem reimbursement rates and are favored amongst the FAMs. Once again, Plaintiff has failed to submit any competent evidence to support her allegation. While Defendant has not produced statistics concerning the so-called desired international destinations, it has submitted evidence that between January 2003 and August 2009, Leidner was ranked ██ ████ ██ CVG FAMs in international trips taken, logging ███ flights for a total of ██ round trips. Furthermore, Leidner's trip calculation did not even begin until she returned from TDY in late 2004. While Leidner testified she did not believe this information was accurate, she cannot specifically recall the international flights she has taken nor has she produced any specific facts to oppose the Defendant's evidence. Moreover, Leidner has traveled to the following countries: ███████████████████████████████████████████████████████

██████████

Even if Leidner had submitted credible evidence to support this allegation, not receiving international flights with higher per diem reimbursement rates is not an adverse employment action, as it was not a materially adverse change in the terms or conditions of her employment.

### 5. Awards and Pay Increases

In 2006, CVG FAMs were eligible for IPI and cash awards. Leidner challenges the manner in which she was assessed for two of the points: firearms and dependability. Leidner claims her poor evaluation was discriminatory. Defendant does not dispute that Plaintiff can prove a prima facie case of gender discrimination, as she was denied monetary

awards that similarly situated male FAMs received. However, Defendant argues it had a legitimate non-discriminatory reason for its actions, and Leidner cannot show pretext.

In July 2006, all CVG FAMs were evaluated for IPI and cash awards based on a ten-point chart identifying various objective and subjective criteria. For her firearms score, Leidner received a "3" out of "5" based on an average of her prior range scores from the last twelve months. The dependability score was derived from ATSAC SSI-49 impressions of Leidner's use of sick leave, her willingness to take additional flights when asked, and her paperwork error rate. After adding all scores from each category, Leidner received a combined score of 42.6. This score was higher than four males on her team. However, Leidner's score failed to qualify her for either an IPI or cash award. Therefore, based on the ten-point evaluation, Defendant argues it had a legitimate non-discriminatory reason for denying Leidner an IPI or cash award.

A plaintiff can establish pretext by showing that defendant's proffered reason either: (1) had no basis in fact, (2) did not actually motivate the adverse employment action, or (3) was insufficient to motivate the adverse employment action. *Tuttle v. Metro. Gov't. of Nashville*, 474 F.3d 307, 319 (6th Cir. 2007) (quoting *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 529 (6th Cir. 2005)). Pretext may also be shown "by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003)).

While Plaintiff fails to argue that Defendant's proffered reason is pretext, she alleges facts that the Court will construe as a pretext argument. Plaintiff contends that despite

41

being denied an IPI or cash award in 2006, she was nominated for a separate time off award in August 2006 based on her dependability. Furthermore, ATSAC [SSI - ] had commended Leidner for being one of the best at her paperwork in February 2007. However, these facts fail to establish that Defendant's proffered reason is pretextual.

ATSAC [SSI - 49] evaluated Leidner in July 2006 and determined her "dependability" score based on her work habits over the past twelve months. During that time she had a 57 percent paperwork error rate, higher than many other CVG FAMs. ATSAC [SSI - ] statement that Leidner was one of the best on her paperwork was made in an email on February 26, 2007, almost eight months after ATSAC [ ] evaluation. Moreover, ATSAC [SSI - ] did not even start working at the CVG Field Office until November 2006, also several months after ATSAC [SSI - 49] evaluation. [SSI - ] Depo at 5). Thus, this evidence is insufficient to show that ATSAC [SSI - 49] evaluation had no basis in fact or was motivated by gender animus. Furthermore, Leidner's August 2006 nomination for a time off award was not inconsistent with her denial of the IPI and cash awards. In August 2006, Leidner's nomination stated that she was "dependable and professional in her appearance and demeanor." [SSI - 49] Depo at Ex. 5). Indeed, in the July 2006 IPI and cash award evaluation, Leidner received above average scores in the categories of: attitude, interpersonal skills, organizational skills, communication, appearance and professionalism. *Id.* at Ex. 2. Therefore, the Court finds the denial of IPI and cash awards is not inconsistent with Leidner's subsequent nomination for a time off award. Consequently, Leidner cannot prove that Defendant's proffered reason is pretextual and her gender discrimination claim based on denial of IPI and cash awards fails.

42

### 6. Failure to Promote

A gender discrimination claim based upon a failure to promote is also analyzed under the *McDonnell Douglas* burden shifting framework. To establish a prima facie case of discrimination based on a failure to promote, the plaintiff must show: (1) she is a member of a protected class; (2) she applied and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) non-protected employees with similar qualifications received the promotions. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).

Plaintiff claims she was discriminated against when she was denied a promotion to ATSAC in 2006, even though she had more supervisory experience than ATSAC [SSI - 49] the male FAM who received the promotion. The first three elements of a prima facie case are not in dispute—Plaintiff is a member of a protected class, she applied for and was qualified for the ATSAC position, and she was considered for and denied the promotion. The issue remains whether ATSAC ████, a non-protected class member, had similar qualifications to Leidner.

Defendant argues that Leidner and ATSAC [SSI - 49] did not have similar qualifications as ATSAC [SSI - 49] possessed superior qualifications and credentials. ATSAC [SSI - 49] had a bachelor's degree from the University of Maryland and spent seventeen years with the United States Secret Service, Uniformed Services Division as an 1801 Inspector. In his last assignment, he served as Senior Course Instructor and Firearms Instructor for the Special Operations Training Sector. During his tenure with the FAMS, [SSI - 49] served as an acting ATSAC for various squad teams and training from January 2004 through the time of his promotion. Knowledge of law enforcement

43

techniques and procedures was a requirement for this position. ATSAC [SSI - 49] had experience interviewing suspects, making physical arrests, executing search warrants, participating in evidence control and the seizure of property. He prepared federal complaints and arrest warrants and had experience testifying at preliminary hearings and during trial. He had experience as a training and firearms coordinator and worked on other special projects. ATSAC [SSI - 49] also received various honoraria and commendations while employed by the FAMS.

Leidner, on the other hand, did not possess a college degree at the time of her application. She was a GS-9 Lieutenant with the BOP, a supervisory position which she held for approximately twenty-two months. Prior to that, she was a Corrections Officer for approximately six years. During her tenure with the FAMS, she never held an acting ATSAC position, nor did she have any collateral or ground-based assignments. However, she was detailed for approximately twenty months to the FAMS Mission Operations Center (MOC) as a controller and watch officer, where she received experience in flight operations and mission assignments. With respect to her knowledge of law enforcement techniques and procedures, Plaintiff had experience interviewing suspects, participating in evidence control and the seizure of property. She testified at preliminary hearings and during trial. She listed no honoraria or commendations on her application.

Despite the fact that Leidner held a supervisory position at the BOP, she possessed no supervisory experience during her four year tenure with the FAMS. However, ATSAC [SSI - 49] had acting ATSAC experience over the course of three years. While Leidner alleges that ATSAC [SSI - 49] only had thirty days of supervisory experience, she has submitted no credible evidence to support this contention. *See* (Davis Depo at 63-64). By

44

her own assessment, Leidner's knowledge of law enforcement techniques and procedures was not as extensive as ATSAC ███ who was an 1801 Inspector with the Secret Service's Uniformed Division. Therefore, the record shows that Leidner and ATSAC ███ did not possess similar qualifications, and Plaintiff cannot prove a prima facie case of gender discrimination.

## E.     Retaliation

Title VII's antiretaliation provision provides: "It shall be unlawful employment practice for any employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Title VII retaliation claims are also analyzed under the *McDonnell Douglas* framework. *See Balmer v. HCA, Inc.*, 423 F.3d 606, 614 (6th Cir. 2005) . In order to prove a prima facie claim of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an action that was "materially adverse" to the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the materially adverse action or harassment. *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Tuttle v. Metro. Gov't. of Nashville*, 474 F.3d, 307 320 (6th Cir. 2007) (citing *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). If a plaintiff establishes a prima facie case of retaliation, the defendant may rebut the presumption by offering a legitimate, non-discriminatory reason for the action. *Morris*, 201 F. 3d at 793. The plaintiff must then show by a

45

preponderance of the evidence that the employer's proffered reason is merely pretext. *Id.*

The Supreme Court has held that the "materially adverse" action requirement in a retaliation claim is different than the "adverse employment action" requirement in a discrimination claim. *Burlington*, 548 U.S. at 67. "The scope of the antiretaliation provision extends beyond workplace related or employment-related retaliatory acts and harm." *Id.* However, the antiretaliation provision does not protect employees from all retaliation, but only retaliation that produces an injury or harm. *Id.* In order to be a materially adverse action, the plaintiff must prove that the challenged action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). It is necessary to separate significant from trivial harm. "[P]etty slights, minor annoyances, and simple lack of good manners" will not suffice. *Id.*

In order to prove a causal connection between the protected activity and the adverse employment action or harassment, the plaintiff must "produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Allen v. Mich. Dep't. Of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999). When an adverse employment action occurs very close in time after the employer learns of the protected activity, such temporal proximity may be significant enough to constitute evidence of a causal connection. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see Singfield v. Akron Metro. Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004) (three month gap between Plaintiff's discrimination charge with the EEOC and termination sufficient to infer a retaliatory motive). However, where some time has elapsed between when the employer learns of the protected activity and the

46

adverse employment action, the employee must produce other evidence, in addition to the temporal proximity, in order to establish causation. *Mickey*, 516 F.3d at 525.

### 1. Count IV Retaliation

In her Amended Complaint, Count IV, Leidner alleges that Defendant retaliated against her for filing an EEO Complaint. The parties agree that Leidner engaged in protected activity when she filed her December 28, 2006 EEO Complaint and that Defendant was aware of the protected activity. However, the parties disagree as to whether Defendant took action that was materially adverse to Leidner and whether it was causally connected to her filing of the EEO Complaint.

Leidner claims that Defendant has engaged in conduct that is "materially adverse" because it was meant to prevent other employees from speaking out about Title VII violations. Leidner alleges that after she filed her EEO Complaint, ATSAC [SSI -] announced at a FAM training session that an EEO complaint had been filed and certain FAMs might be witnesses in the matter. Leidner further contends that several FAMs understood that ATSAC [SSI -] was referring to Leidner's complaint. Moreover, Leidner alleges that ATSAC [SSI -] publically threatened Leidner in a training session, while holding her EEO Complaint. Leidner also claims that FAMs were required to stay later on training days because EEO complaints had been filed. Leidner alleges that she has been subject to intense scrutiny and criticized for any mistakes she made in her paperwork or the performance of her job. She also claims that ATSAC [SSI - 49] made derogatory comments about her and blamed the filing of her complaint for the imposition of unpopular policies. FAMs have stated they do not want to fly with Leidner for fear that they will be forced to participate in her litigation. Several FAMs have also made allegations that they were

47

retaliated against for testifying favorably in Leidner's EEO investigation or in their depositions for the present case. Leidner claims that all of this has made it difficult for her to perform her job and work together with fellow FAMs.

Despite Plaintiff's numerous allegations, she has very little credible record evidence to support them. First, Plaintiff has not presented any evidence to support her contention that ATSAC [SSI - 49] made derogatory remarks about her. Indeed, her allegation is without any citation to the record. Likewise, Plaintiff's accusation that ATSAC [SSI - ] threatened her while holding her EEO complaint is without merit. Leidner testified that she could not see what ATSAC [SSI - ] was holding in his hand when he warned FAMs to be careful what battles they pick. ATSAC [SSI - ] testified that he was referring to the FLSA lawsuit going on at that time, and Leidner has not presented any evidence to rebut this. Furthermore, Plaintiff's allegation that FAMs were required to stay later on training days due to EEO complaints is speculative at best. In fact, when questioned, Leidner could not even remember if she was at the meeting where this was supposedly stated and who actually said it. Leidner also claims she was subjected to intense scrutiny after the filing of her complaint, but besides the vehicle registration and travel vouchers investigations, discussed below, she has again failed to present any evidence to support this allegation.

The only allegations for which Leidner has presented competent evidence to support are that CVG management has discussed Leidner's EEO complaint with fellow FAMs and has intimidated witnesses in the present case. However, Leidner has failed to prove that the act of alerting fellow FAMs that they will be interviewed or possibly deposed by EEO investigators or counsel constitutes a materially adverse action that would dissuade a

reasonable employee from making or supporting a charge of discrimination. Surely employees who file EEO complaints or lawsuits understand that an investigation will take place; in fact, they expect an investigation to take place. No evidence has been presented that CVG management publically announced Leidner's EEO complaint in an effort to intimidate or humiliate her in front of her co-workers. Therefore, the Court finds that notifying witnesses that they may be interviewed or deposed regarding Plaintiff's EEO complaint and subsequent lawsuit does not constitute a materially adverse action.

Plaintiff also contends that CVG management retaliated against her by intimidating witnesses in her case. Defendant contends that Plaintiff has not suffered any adverse employment action attributable to this activity because the action was allegedly taken against other employees, not against Plaintiff. While the Supreme Court has expanded the types of retaliation that constitute a materially adverse action, the retaliation must still produce an injury or harm to the plaintiff. *Burlington*, 548 U.S. at 67. Leidner has not identified any actual harm that she suffered as a result of the alleged intimidation of witnesses. Plaintiff has not offered testimony that any witness has not testified truthfully or has refused to testify in her favor. Therefore, Leidner has failed to establish a prima facie case of retaliation with respect to these claims.

On February 12, 2007, the DHS's Office of the Inspector General received an anonymous complaint that Leidner had not registered her vehicle in accordance with Kentucky's vehicle licensing and registration regulations. (Doc. #65 at Exs. CC, EE). On May 3, 2007, FAMS Policy Compliance Unit (PCU) forwarded a copy of the complaint to the CVG Field Office with instructions to investigate the allegation. (Doc. #65 at EE). Leidner was then notified that she was under investigation for failure to properly plate her

49

vehicle. The investigation found that the vehicle in question did not belong to Leidner, and she was verbally counseled about the need to comply with state vehicle registration and licensing guidelines. However, no disciplinary action was taken against her. *Id.* The PCU's file on this matter was closed on August 14, 2007.[44]

Leidner has not proven a prima facie case of retaliation with respect to the vehicle registration investigation because she has failed to prove that the investigation was a materially adverse action. Besides the mere inconvenience of being called into the office and showing proof that this was not her vehicle, she has not suffered any action that would dissuade a reasonable employee from making or supporting a charge of discrimination. Indeed, Leidner has not presented any evidence that she sustained any injury as a result of the investigation.

Even if Leidner could establish a prima facie case of retaliation, she could not prove that Defendant's reason for investigation–the filing of an anonymous complaint–was pretext. In order to refute Defendant's proffered reason, Leidner must "produce sufficient evidence from which the jury could 'reasonably reject [the Defendant's] explanation' and infer that the [Defendant] 'intentionally discriminated' against her." *Balmer*, 423 F.3d at 614

---

[44] Leidner asserts that according to ASAC Britsch's deposition testimony, this matter is still an ongoing investigation that has never been closed. Therefore, she contends that while an investigation is open, she is unable to transfer to another FAM office and is not eligible for awards, pay increases or promotions. While ASAC Britsch testified the matter is ongoing, he did not testify that the ongoing matter concerns Leidner. In fact, when asked if Leidner was still under investigation for this matter, ASAC Britsch responded, "[s]he's not;" however, according to the deposition transcript, it appears as though he did not finish his answer, as his attorney advised him that he cannot discuss it. (Britsch Depo at 137). ASAC Britsch stated that other issues came up once the Montana vehicle was actually looked at, but he could not disclose any further information because it is an open matter. Given that the vehicle in question did not actually belong to Leidner, there is no reason to believe that the ongoing investigation involves her. Furthermore, the evidence shows Leidner was eligible to receive awards even if this investigation is still open. Leidner received a two percent IPI in March 2008. (Doc. #65 at Ex. MM).

50

(quoting *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 246-47 (6th Cir. 1997)). Defendant has produced a copy of the anonymous complaint that it relied upon. Leidner has not submitted any evidence that CVG management, in an effort to retaliate against her, was involved in making the anonymous complaint. It would be pure speculation to conclude otherwise. Furthermore, the investigation was dropped once management determined that the vehicle in question did not belong to Leidner, and she was never disciplined as a result. Leidner attempts to discredit Defendant's reason by presenting evidence that ATSAC **SSI** had his car plated in Georgia for nine months after he came to the CVG office, yet he was never placed under investigation for failure to plate his car properly. However, ATSAC **SSI** situation is clearly distinguishable from Leidner's. First, ATSAC **SSI** testified he was a resident of Georgia at the time he moved to the CVG Field Office. (Schill Depo at 59). On the other hand, Leidner was a resident of Kentucky and had been for several years before the investigation. More importantly, no one ever filed a complaint against ATSAC **■** regarding his vehicle registration. Leidner was not put under investigation until a complaint was filed. Therefore, Leidner's retaliation claim regarding the vehicle registration investigation will be dismissed.

### 2. Count V Retaliation

Plaintiff also claims she was retaliated against when a thirteen month old investigation regarding travel vouchers was reopened and resulted in a temporary revocation of Leidner's security clearance. In this Court's March 3, 2010 Order (Doc. #60) denying Plaintiff's Second Motion to Amend the Complaint, it recognized that the Sixth Circuit has held that federal courts generally lack jurisdiction to review an agency decision

51

to revoke a security clearance. *Tenenbaum v. Caldera*, 45 F. App'x 416, 417-18 (6th Cir. 2002) (citing *Dep't. of Navy v. Egan*, 484 U.S. 518 (1988)). . Security clearance decisions are made pursuant to constitutional authority vested in the Executive Branch. *Egan*, 484 U.S. at 527. Judicial review of such decisions is strictly limited to narrow circumstances, such as where an agency is alleged to have violated its own regulations in revoking the security clearance.[45] *Tenenbaum*, 45 F. App'x at 417-18. Because a determination to grant or revoke a clearance is based on a prediction of an individual's potential to compromise sensitive information, it is "not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Egan*, 484 U.S. at 529. Unless Congress specifically provides otherwise, courts are unable to review an agency decision regarding revocation of a security clearance. *Id.* at 530.

In May 2009, Leidner was put under investigation, for a second time, for two $109.00 voucher mistakes that were made in 2006.[46] During her interrogation, Leidner was informed that she was now under investigation for giving a false statement in the prior investigation, thirteen months earlier.[47] The May 2009 investigation later resulted in a

---

[45] Plaintiff has not alleged any violation of the agency's own procedures.

[46] On August 4, 2006, Leidner submitted a travel voucher for July 27, 2006 and claimed a full day per diem for London, England. However, on that date, Leidner actually arrived in New York at 2:33 p.m. and, since her connecting flight to Cincinnati was canceled, spent the night in New York. This resulted in a $109 overpayment. Further, on August 26, 2006, Leidner submitted a travel voucher for August 10, 2006 and claimed a full day per diem for London, England. However, on that date, Leidner arrived in Boston, MA after her flight was diverted and ended up spending the night in Boston. This also resulted in a $109 overpayment. (Doc. #51-3).

[47] The prior investigation took place on April 22, 2008 by the TSA's Office of Investigation (OI). Leidner was originally interviewed because she was identified as one of the FAMs who traveled with a former FAM being investigated. However, on May 12, 2009, she was interviewed again, this time for allegedly giving a false statement in the April 2008 interview. Leidner was interviewed once more on September 4, 2009. The

determination to revoke her security clearance. (Doc. #51-3). However, since the filing of Defendant's Motion for Summary Judgment, the investigation has been dropped and Leidner's security clearance has been reinstated, a point confirmed at oral argument.

At the time Leidner's First Amended Complaint (Doc. #33) was filed, in which she claimed the May 2009 investigation was in retaliation for her filing of an EEO Complaint, she had no knowledge that her security clearance might be revoked. Leidner asks this Court merely to look at whether the *opening* of the travel voucher investigation was retaliatory and urges the Court can do this without reviewing the actual decision to revoke her security clearance. Leidner contends the travel voucher investigation is wholly separate from the agency's decision to revoke her security clearance.

While the Sixth Circuit has not directly addressed the distinction Leidner attempts to make, other circuits have. The Fourth Circuit found that "the distinction between the initiation of a security investigation and the denial of a security clearance is a distinction without a difference." *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996); *see also Hill v. White*, 321 F.3d 1334, 1335-36 (11th Cir. 2003). The court reasoned that the issue of whether there were legitimate reasons to investigate in the first place "goes to the very heart of the 'protection of classified information [that] must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Becerra*, 94 F.3d at 149 (quoting *Egan*, 484 U.S. at 529). The reasons why the investigation was initiated may very well be the same reasons why the

investigation resulted in a Report of Investigation (ROI) #I-09194, dated October 15, 2009. Based on this report, the TSA's Office of Security, Personnel Security Division made the decision to temporarily revoke Leidner's access to classified information. (Doc. #51-3).

clearance was ultimately revoked. *Id.* Therefore, if allowed to review the initial investigation of a security clearance to determine whether it was retaliatory, the court would be reviewing the very issue that the Supreme Court has held is non-reviewable. *Id.*

The instant case suffers from one factual difference than the *Becerra* case: the initial investigation was not specifically a security investigation, rather it was an investigation regarding travel vouchers. Thereafter, the second May 2009 investigation occurred because it was determined that Leidner gave a false statement in the April 2008 interview.[48] It was for that very same reason-lack of candor-that the TSA's Office of Security decided to revoke Leidner's security clearance. Leidner even admits in her Response, that the revocation of her security clearance "shows how even petty investigations have serious consequences and can end a federal career." While Leidner disagrees with the investigation and subsequent security clearance revocation, she admits that the revocation was a direct result of the travel voucher investigation. Therefore, the Court cannot separate the May 2009 investigation from the decision to revoke Leidner's security clearance. The Court agrees with the *Becerra* holding and finds that any review of the May 2009 investigation would also be a review of the TSA's ultimate decision to revoke Leidner's security clearance. Therefore, the Court lacks jurisdiction to review Count V of Plaintiff's Amended Complaint and it will be dismissed with prejudice.

Even if the Court had jurisdiction over the Count V retaliation claim, Plaintiff's claim would fail as she cannot establish a prima facie case of retaliation. Plaintiff has presented

---

[48] It is unclear whether this second investigation was initiated specifically as a security investigation. However, it is clear that it was done as a result of alleged false statements given by Leidner in the April 2008 investigation. Furthermore, Leidner only alleges that the May 2009 investigation was retaliatory, not the initial April 2008 investigation.

no evidence that there was a causal connection between the filing of her EEO Complaint and the May 2009 investigation.

## III. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. #61) is hereby **GRANTED**. Within **ten (10) days** counsel for Defendant shall file a Notice identifying which portions of this opinion, if any, it believes should be sealed pursuant to the Court's prior Protective Order.

This 23rd day of November, 2010.



**Signed By:**
**David L. Bunning** $\mathcal{DB}$
**United States District Judge**

G:\DATA\Opinions\Covington\2-07-197 MOO Granting MSJ.wpd